Thank you, Your Honors. My name is David Ness. I'm with the Federal Defenders of Montana, and I represent James Young. As the Court is aware, Mr. Young is serving a term of 210 months. None of your office can afford to send you here. Her office can't afford to send you here. We manage our money better together. My husband wants to keep me away from Nordstrom's, Your Honor. And apparently, you know, you manage your money better and you don't share. That's correct. That's correct. At any rate, Mr. Young was convicted, as the Court is aware, of two counts of aggravated child abuse. It's our position that the evidence that was used to convict Mr. Young was derived from methodologies and sources that are known to be scientifically unreliable. It was also based upon the testimony of a witness that, at least on the basis of his testimony in court, appeared to be incompetent. And it was based upon testimony that was not only internally inconsistent, but also inconsistent with the known physical facts. Further compromising the conviction of Mr. Young is the fact that when these issues were tried to be brought to the attention of the jury, the district court, in essence, shut us down, both through its rulings based upon the testimony of our expert witness, as well as its rulings into on some of the cross-examination issues that were presented. I think that probably the to get this started, because all of these issues, to me, I think, tend to roll in together. And it has to start, I think, with our request for a taint hearing. That's not something that Federal courts approach very often. Probably those sorts of issues are raised primarily in State courts, because Federal courts, in general, aren't used to dealing with child sex abuse cases. Ginsburg. Counsel, what procedurally, what would be the mechanism procedurally under the Federal rules or Federal authority to request a taint hearing? Well, what I go back to and what I discussed in my brief were the eyewitness identification cases. And what we've used further is the methodologies that's been outlined in the State Court in New Jersey. Now, what we did was we came forward, I think it's fair to say, with evidence that if believed to be true, would establish that these children's testimony was unreliable, that it had been derived through interviewing techniques that are known scientifically to be invalid, that are known to result in unreliable statements, unreliable evidence. And we did that. What would be our review on the taint hearing request? What's the standard of review for that, do you think? What I've suggested is that the Court use the standard of review that the Court uses in the eyewitness identification cases, because I think that the issue is primarily the same, and that is de novo. Well, in the eyewitness identification cases, doesn't there have to be some kind of preliminary showing before, I mean, before there's a hearing? There is. And I would agree that I think that a defendant in a child sex abuse case that's trying to come forward asking for a taint hearing bears the same burden. Okay. What was the evidence that you are saying you put forward which would justify holding a taint hearing? Well, for instance, with Taylor, the second child. We not only submitted a brief, but as I recall, we also submitted the actual reports that were made by the child welfare officer that conducted the interview of Taylor. And this is what we knew. We knew that Taylor was removed from the house at the end of November. We knew that he had stayed in foster care for about a month. At the beginning of January, he was interviewed by his child welfare worker. Before he was questioned by the child welfare worker, he made no statements whatsoever inculpating Mr. Young for any form of abuse. She asked him several questions at the beginning of this interview, which lasted about an hour and a half. He never made any statement that Mr. Young abused him. She began asking more direct questions. Then she started showing him anatomically correct pictures of naked boys, naked girls. In fact, she didn't have a picture of a naked boy because what she did was she actually had to draw a phallus on the girl to get him to start talking about those things. So, counsel, what would you – what were you requesting the court to do just to press the evidence? If your theory was correct, you wanted the court to do what? We would want the court, similar to the – in the eyewitness identification cases, to exclude the – to exclude the testimony as unreliable. It was the – or I guess at the very least, what the first step would be is for the hearing. And we presented prima facie evidence that, in fact, this evidence was derived through means that are known to produce unreliable results. Then it's incumbent upon the government to come in and say, well, nevertheless, even if these were used, this evidence still has some indiction of reliability and, therefore, it should go to the jury. Now, what – wouldn't it be within the court's discretion to determine whether or not to hold the hearing? And if to hold the hearing, to determine whether or not the evidence should be excluded, wouldn't that be within the court's discretion? I don't think so. I don't think so in the initial instance. And I would also back up to the actual context of this case. Then give me your case authority that you're relying upon to say that it's not in the case of discretion to determine whether or not to hold the hearing. Well, as I understand the eyewitness identification cases, is that if I come forward with evidence that a witness that's placed my client in a bank was subjected to procedures that would tend to suggest the answer to him or her, it would tend to taint or contaminate, if you will, that person's identification. And it's incumbent upon the court to hold the hearing. And if the court doesn't hold the hearing – What's your best case authority? Which case are you relying upon? Which eyewitness case do you think is closest to yours and mandates a hearing? Well, I recall, I think out of the Ninth Circuit, it's the Bowman case. And the Bowman case essentially – in the Bowman case, the Ninth Circuit essentially said that we're going to use the de novo standard when reviewing a district court's decision to deny a Wade hearing. Your – the eyewitnesses' cases, don't they rely on due process? And they do. And that's quite candid. Is it your argument that this was a violation of due process? Quite candidly, yes, Your Honor, yes. That if you are going to take a young child, and if you are going to subject that child to interviewing techniques that we know, through the studies, through the scientific literature, will suggest and contaminate that child's testimony so that that child essentially doesn't know – does – if the answer is implanted, the answer is suggested, that what you're – you're potentially basing a person's conviction on unreliable evidence. And it's the same analysis. Counsel, this is a little different, because in the eyewitnesses' amputation cases, it's a case-by-case analysis. We need evidence specific to that particular case as to why the eyewitness testimony may be suspect. But you wanted to rely on a general body of work, didn't you? Isn't that what you said, that you put in briefs and studies? Well, maybe – I don't know if I'm understanding you correctly, Your Honor. But no, I don't think that in every single child sex abuse case that someone's going to be entitled to this – to a so-called taint hearing. I think if all you have, for instance, is spontaneous statements made by the child, and there's no evidence whatsoever that the statements were derived through any sort of interviewing or interrogation, then I – I would tend to agree that there – that there's – there's no evidence to support a request for a taint hearing in that case. But when you have evidence and – and you have clear evidence that the child was – was – was compelled to engage in repeated interviews, that there were all sorts of improper techniques that were utilized during those interviews, then I think a taint hearing is in order. And in that hearing, the centerpiece of the hearing would be what actually happened in this case rather than general studies? Oh, correct. Comparable to what actually happened in the eyewitness identification case? Correct. And you're arguing that the two are analogy – analogous because in both instances there has been improper suggestion, with the consequence, according to you, that we get untruthful testimony or inaccurate identification? Yes. Okay. Yes. Yes, and I – Why aren't you protected by bringing this all out as part of the defense, part of the jury? For the – for the same reason that they talk about – that the Supreme Court has talked about in the eyewitness identification cases, it's – it's not a matter of the individual line. And so cross-examination isn't necessarily the best vehicle to use here. What happens, especially with – I think probably more so with children, because they don't quite understand the mechanisms of what's going on here, but through the repeated questioning and implanting the suggestion that they've been abused, what you have is you have a child up there that thoroughly and completely believes what, in fact, has happened to him or her. And furthermore, especially through the repeated interview process, as we had here, probably going on 14, 15 different interviews with these children, their answers tend to become rote. And so the cross-examination isn't necessarily something that's going to expose the weakness in the government's case. Counsel, are there any cases anywhere in this country that have adopted this theory that you are espousing now regarding a tank hearing? Yeah. Not in the context of eyewitnesses. In the context of child testimony in child abuse cases. Do you have any cases? Yes. I think the New Jersey case, I've cited it extensively in my brief, actually is the seminal case, the seminal case that came forward with, listen, this is the way we're going to handle this. And because the New Jersey Supreme Court had all of this evidence that the children in that case involved multiple children, multiple allegations of abuse that these children had been led to perhaps make those allegations. Now, isn't a partial answer, at least a partial answer to Judge Allerton's question about, look, isn't another way to handle this is to have evidence introduced at trial by which the jury can judge itself whether or not this has been tainted, to say, well, yes, maybe, but in this case we weren't permitted to put it on. That is to say we weren't permitted even to find out what the question was that you'd asked because you call it attorney-client privilege. We're not permitted to put on our expert who says, well, this is what happens. This is how it works. Right. And I think that's correct. And I was going to get to that, is that in this case we were essentially blocked from even presenting that sort of evidence because although our expert witness could get up there and talk generally that, well, these are the proper ways of interviewing a child, he was not allowed to explain to the jury that, well, look, if you continually repeat these sorts of questions, if you continually use these improper techniques, what you're going to end up with potentially is an implanted memory. If we agree with you that it was error not to permit the Dr. Hespelin. Hespelin. Yes, sir. You probably would because if you reversed and went back down, I would ask for a taint hearing, I think, so maybe for a taint hearing. It's like a decision. Right. Yes. We need to reach it in the sense that the question is going to come up again, not necessarily that we need to reach it in order for us to decide whether it's a taint hearing. That's correct. Yes. Okay. Yes, sir. You'd like us to have a more extended conversation with the district judge, in other words. Right. Counsel, why in your brief is the New Jersey case cited? It would be on... State v. Michaels, Your Honor. It's on page 24, 25, 26, 29, and 43. Thank you. Counsel, this has been a long day for us. You may have talked about it and I may have missed it. One of the issues you raised is that the court erred in failing to determine whether this child was competent to testify truthfully. Have you argued that point? I have not argued that point. But you argued that point. Okay. Your Honor, what happened was this child was called initially, and the child was called in front of the jury. And the child was asked a series of questions such as, do you know why you are here? Do you know what it means to tell the truth? When he was asked if he knew what it meant to tell the truth, he shook his head indicating no. When asked if he could tell the truth, he shrugged his shoulders. What the court did is the court determined at that point that the child was scared. Essentially. And that was preventing the child from being able to testify in front of the jury. So the court ordered that the child be examined in the form of a deposition. Now, I think when you look in the end, and actually the tape should be in the court record of that actual deposition. But the court went through a series of yes-no type questions. Do you know what it is to tell the truth? The child, yes. Will you promise to tell the truth? Yes. Will you promise not to lie? Yes. And at that point, the court decided that the child was competent to testify. But I think what's more interesting is that when you get into the questioning from the lawyers, Ms. Sewick asked the child, there was a point she said, now, your shirt's white. If I ask you if your shirt, if I say your shirt is black, is that the truth or a lie? There's twice the child said that that's the truth, even though he had just said his shirt was white. And it really wasn't until the third question, and I think that almost kind of goes to show how these taint cases work. The child figured out essentially what Ms. Sewick wanted him to say, and he changed his mind and said yes. When I asked the child, well, what is a lie, the answer that I got back was, it's like when I go to the park with my brother. It made no sense. It wasn't even really responsive to the question. And so I asked the Court on numerous occasions, in writing and orally, you know, look, I think that there's a question with this child's competency. I would submit that although I would agree that it's a fairly heavy burden for me to carry to get the Court to hold a competency hearing, when you're getting answers like that, there's, I think, a real indicia that this child doesn't understand the difference between truth and falsehood, doesn't really understand the purpose for him being there. And therefore, the Court should have ordered a competency hearing of that child to determine whether or not the child was even competent to testify. Counsel, is there any significance to the fact that the competency request was made orally and not in writing? It was made. I made it orally initially. And then like you do during trial, you go back, you read the rule, and I did a written motion. So it was put in writing. And with that, I'll reserve any time I have left for rebuttal. Thank you. Just over three minutes. Your Honors, in this case, the standard regarding whether the district court should have held the tape. Can I interrupt you for just a minute? I know we've seen you before, but these tapes exist independently. So if you could identify yourself for the record for this tape. Oh, I'm sorry. That's all right. I don't mind. My name is Lori Sook, and I'm an assistant United States attorney from Great Falls, Montana. There we go. The standard in this case the government would wish the court to adopt would be that that the court uses whenever it's considering the denial of an evidentiary hearing by a district court, which is abuse of discretion. Because that's what was being asked here, essentially, is to exclude evidence. Exclude the testimony of the child victims. And in this case, it was well within the discretion of the district court to rule that as long as the children were competent, any issues with respect to reliability didn't go to admission, but they went to the weight that the jury would give to the child testimony. In this case, it is you need to look at the whole record to determine what happened. The government does not agree with the defendant that the defendant was denied his ability to present his defense. In this case, both child victims were subject to thorough and extensive cross-examination. The defendant was allowed to present Dr. Esplin's testimony about procedures that were appropriate for interviewing children of this age and techniques that are good and bad. What the expert wasn't allowed to do was to comment upon these children. I'm sorry. Yes, I can now. I'm sorry. I'm sorry. Opposing counsel had referred us to the case of State v. Michaels for a paradigm as to how a taint hearing would proceed. Do you agree that that case involved a pretrial determination of whether or not the evidence was tainted? Yes, it does, Your Honor. It's the only case that I was able to locate as well. All right. Do you think it not? And I understand that one case shades into another, but I'm not for the moment asking for application to this case. Do you think that a taint hearing in cases where we have child sex abuse and there is some reason to suspect or even to think fairly strongly that there have been improper techniques used, do you think a taint hearing is a bad idea? Your Honor, it's not a bad idea. I just disagree with defense counsel. It would be done in every child sex abuse case, because — Well, let me keep going then. If it's not a bad idea, let's push it a little further. Do you think it's an affirmatively good idea? Your Honor, it's not necessary. I don't know that it's a bad or a good idea. It's not necessary. Well, I'm hypothesizing a case that I'm not making this case. I'm hypothesizing a different case where we have very strong reasons to think that improper techniques have been used and that these children are now testifying to things that they have no idea whether are true because they're so tangled up from the testimony. Do you think a taint hearing would be a good idea to find out, okay, what actually happened? I don't mean to be evasive. It's just hard to answer that question, because I'll answer it in this context. If we did have a taint hearing and the result would be excluding the children's testimony, why do we have juries? It would solve the question. Well, the question there might solve it. We're not relying on the ability of a jury to determine this anymore. This has always been the purview of the jury to determine credibility. Well, but let me ask it this way. Why is it not then equally the purview of the jury for eyewitness identification procedures? I don't believe the eyewitness identification cases are that similar to child sex abuse cases. Because? Because in that particular situation, there is the procedures. I guess I don't really have a good answer, Your Honor, regarding that. Now, another thing you said, and you might be right, earlier on but in the same conversation, you said, but if we're going to have taint hearings when there is some reason to believe that improper techniques might have been used, you said, but that means we're going to have to have taint hearings in, I'm not sure if these are precise words, but pretty much all of these cases. Is that right? I believe so, Your Honor. And that might be a good thing or is that a bad thing? I mean, if we have some reason in every one of these cases to worry about the reliability of the testimony, why don't we investigate it? That's the purpose of the jury. The jury, as long as the witness is competent and we've determined that, the jury decides whether these witnesses are reliable. Well, in this case, okay. It would replace. Okay. Now I'll come back to this case, assuming that I agree with you on that one, although I regard it as an interesting and open question. But assuming for the moment that I agree with you that a taint hearing was not required, you then said, but assuming the witness is competent and it's for the jury to decide, in this case, we have not had a hearing as to whether this particular witness was incompetent or competent, and we've also had the district judge shutting off lines of questioning that would have informed the jury as to whether or not techniques were reliable or unreliable. So, yes, maybe it goes to the jury, but was the jury given enough information in this case? They were, Your Honor, because it was within the discretion of the district court to limit cross-examination, to say that the defense was shut off from avenues of cross-examination is just not supported by this record. The district court limited the ability of the expert witness to testify by linking his testimony specifically to what was done in this case. The defendant cross-examined the witnesses in ad nauseum about the interviews and the inconsistencies between those interviews. It was only shut off with respect to cross-examination when specific questions, when it was asking a specific question of the prosecutor, but not the information that was gleaned. And, therefore, the jury was advised of the repeated interviews, revised of the techniques that were used, advised of all of the inconsistencies. They heard all of that information. Excuse me. Counsel, was the jury apprised about what improper techniques are? The district court limited that testimony of the expert. Wasn't that crucial in this case? Well, what was important is that, in this case, he testified about what were the proper techniques and then the defense used that information, I think properly, to argue what was done improperly. By using that information and linking it to what the social services worker did in this case, they were able to get that information to the jury. So they were given a context of what was right and then they linked it to what was wrong. We know the argument of counsel is not evidence, so that wouldn't be considered by the jury under the court's instructions, the argument of counsel. But all of that was in the record. The evidence from the expert and then what Yvonne Martin did in the case. So they had all of that information. They were told what was right and then they were told what Yvonne Martin did. But they weren't told what was wrong. That's the missing piece. But an expert doesn't need to tell the jury everything to give them the ultimate question that these witnesses are incredible because that's their purview. They're given the pieces of information and then juries link it together. And that's what the district court did here. He allowed the information to be put in to give the juries the tools they needed to determine whether these witnesses were credible. And in that way, the government doesn't believe in any way, whether we're talking about the taint hearing or the limits of cross-examination that the district court aired. Ms. Silk, I gather that you did, as a good prosecutor would do, you interviewed your witnesses before they were put on the stand, including these children. Yes, Your Honor. And, of course, your interviews, given the nature of testimony of young children, that's part of the question as to whether or not the testimony was improperly influenced by questions. And I have to say, I'm not accusing you of improper influence. I want to make sure that I'm clear on this point. But if it is an appropriate thing for the jury to know whether their children were improperly influenced by questioners, why can't the jury be told what you asked? Because I understand that the judge said, no, that's attorney Klein. But if we're trying to figure out, is this witness reliable, and we are trusting the jury to be able to assess it, it seems to me that that is highly relevant information. What are the questions you asked, and in what context? That would completely infringe on the ability of a prosecutor to prepare their witnesses. If they were able, if everything that was done, spoken to between the witnesses, was fair game for the defense. Yeah, but I'm only talking, or this case is only talking about young children for whom the questioning may have some influence on their testimony. I'm not talking about adults. I'm not even talking about teenagers. I'm talking about very young children in this particular context, which is a child sex abuse, where we know that the issues are somewhat different. And, Your Honor, to be clear on this, the issue regarding the record was the fact of one disclosure that was inconsistent to the prosecution, and that's that white stuff came out. Yes. And I gather from... And the jury heard that. And correct me if I'm wrong. That was told to you by the witness and had not been told to previous questioners? Yes. So it comes out for the first time when you're questioning that witness in preparation for trial? Yes. And the jury heard that. Heard what? They were told that. The jury heard what? For the first time, that information came out during an interview with the prosecutor and hadn't been told in previous interviews. They were told that. But the jury was not allowed to know what the form of questioning from you was. No. The jury was not allowed to know, for example, well, I asked three times. I'm totally making this up, okay? So this is now hypothetical. The jury was not allowed to know that you asked the question three times before you finally got the answer. No, they weren't. Okay. With respect to the competency of Sterling in this case, we need to look at the whole record, not only the reason why there was ever any issue regarding a video deposition, which was clear that had nothing to do with competency. There's nothing in the record to dispute the judge's finding that Sterling could not testify because he was afraid. It was fear, nothing more than that. So therefore, that should not concern the court regarding whether he's competent. Now we move to the video deposition. Counsel, what about the fact that he expressed some uncertainty regarding the difference between the truth and a lie? He did, with respect to that, have some uncertainty. But looking at the context of his testimony, including questions asked by the prosecution, he was clearly a competent witness because it's not only the difference between a truth and a lie, but what is the ability of this witness to recollect? Counsel, before we leave that, wouldn't you agree, though, that that's one of the crucial indicia of competency is the ability to differentiate between the truth and a lie? It is. And this record doesn't support the fact that he, that there is no evidence he could indicate between the truth and a lie. It's just. Counsel. Let me ask you this way. What evidence is there in the record to support the proposition that he does understand the difference between the truth and a lie? Well, the colloquy between him and the district judge, for one. Specifically, what questions and what answers? There was information that I, in my original questioning, talking to him about the colors of clothing. Although he did get one portion wrong, he did get other portions right during that when we were talking about the truth and a lie. What portion of the record, what pages in the record are you referencing? Let me grab the excerpt, Your Honor. Take your time. We can wait. Don't worry. And wouldn't you know, I lost that. Try excerpts of record sixty one, sixty two. I'm just getting there, Your Honor. And I have to say I was helped. I was Mr. Mr. Ness supplied that suggestion. Yes. We look we look at what I was talking to him about. Sterling, what color shirt do you have on white? It's on page sixty two, Your Honor. OK. And see, this is actually what happened. Sterling, what color shirt do you have on? White. And that was a correct answer. You have a white shirt on. I think your shirt is black. Is that the truth? Sterling, use your words. The witness. Yes. And that was a wrong answer. Is that the truth that your shirt is black? Yeah. Your shirt black or no? And I believe that the problem there was my questions were very inartful regarding that. I shouldn't have been trying to. You shouldn't have been trying to impeach your own witness. Exactly. I was trying to establish something in confusing him. What color is your shirt? What what color is my shirt? I don't know what color that is. It's kind of white hot. Not just had affirmatively. All of that needs to be brought in context with what Judge Haddon did. So that would be where it is in the record, Your Honor. What about when a pausing counsel asked him to give an example of something that was not the truth and he talked about going to the park with his brother? Right. And the way that I interpreted that and it was just listening to him, the record clearly it's hard to say that. What he was trying to say was when I go to the park with my brother, when I tell my brother that I'm going to the park with him and he's not going to do it, that's a lie. That's how I was interpreting what he was saying there. But obviously Mr. Ness interprets it differently and it's hard to read it from the cold record. He was giving him an example of what a lie would be when he lied to his brother about going to the park. Did you follow up on that to clarify your? I did not, Your Honor. I believe that we've covered pretty much most of the major issues. There are three other issues that were raised in this appeal, a hearsay issue, which I believe that statement was admitted by the judge not for the truth of the matter asserted but the government's argued that statement could have been admitted as an excited utterance as well. And then the denial of the Rule 29 and we believe there was sufficient evidence for the jury to convict here and then cumulative error doctrine and obviously we don't believe errors were committed here and therefore we don't believe the doctrine should be invoked. Are there any additional questions? I think that's it. Thank you very much. Thank you. Mr. Ness, I think you saved a little time. I'll try to be very brief so we can all go eat lunch. The first thing I want to point out though is that I don't think that every case is going to result in a taint hearing. Number one, in a number of these cases you do have physical evidence. There's DNA evidence or there's injury to the child. There's a confession and that probably happens, as in all criminal cases, probably in about the majority of the cases. What we're dealing with here is a small subset of cases in which basically the only evidence against the defendant is evidence that's been induced through interviewing techniques that are known to produce unreliable results. The second thing is this. Such a hearing. Shouldn't the defense have to provide in a motion supporting declarations or affidavits which would support the claim that it was suggested? Something. Or say in this case, I mean, we may not be able to necessarily get the affidavits, but we could produce the actual reports that were made by the investigating officers or the yeah, I would agree. I think that the burden is initially on the defense to even get the hearing. Yes. You don't get it just for the asking. Right. I think that's correct. The second thing is with respect to the statements that have to deal with the work product question. Ms. Sewick said something that I think sort of minimizes the importance of that evidence. She indicated that that was one answer that I think she says was inconsistent with the government's case. I think I realize what that answer was. This child had never, ever made any statement about white stuff coming out. We're talking about a young child. This is age-inappropriate information. And I would submit that that kind of information coming out of a child is something that would have a profound effect on the jury. And so I don't think by any stretch of the imagination that our inability to cross-examine how that evidence was derived could be considered harmless or unimportant in this case. And the third thing I'd want to point out is with respect to the expert, I think it was crucial because although the expert could say, yeah, this is the way that you should do these sorts of interviews, never was the expert able to explain to the jury that in general, as a general class, that when you don't use these standards, these are the dangers. And that is something that I think, despite the government's arguments in the past and maybe even here, is I don't think something that's within the common knowledge of certainly the majority of jurors. I mean, what we're looking at here is we're looking at a body of psychological studies and evidence that certainly the average juror, that's not something that's within his or her knowledge. Were you allowed to ask hypothetical questions? Of the expert? Of the expert. No. No. Did you pose hypothetical questions to the expert? Judge Haddon told me where I could go. And I'll tell you, in Judge Haddon's court, I tried to do what he says. On the record? Yes. Yes, yes. It's pretty clear on the record. Thank you. Thank you very much. We've had very helpful arguments on all of our cases this morning. United States v. Young is now submitted. And, Ms. Souk, you can tell your boss you earned your money today. Thank you. That concludes our oral argument cases for the day. We're now in adjournment until tomorrow morning. All rise. In support for this session, stand adjourned. Thank you.
judges: Alarcon, W. Fletcher, Rawlinson